IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| Trisha L. Hernandez,<br><br>            Plaintiff,<br><br>    vs.<br><br>Commissioner of Social Security,<br><br>            Defendant. | CASE NO. 3:23-cv-569-JRK<br><br>DISTRICT JUDGE<br>James R. Knepp II<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Trisha L. Hernandez filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

**Procedural background**

Hernandez previously filed an application for disability insurance benefits and supplemental security income in July 2016. Tr. 79–103. In her prior application, Hernandez alleged a disability onset date of October 5, 2014. Tr. 82. An ALJ held a hearing and, on December 6, 2018, issued a written decision finding that Hernandez was not disabled. Tr. 82–95. The prior ALJ found that despite multiple severe impairments including "[d]iabetes mellitus

with neuropathy[,] affective disorder[,] COPD bronchitis asthma[,] a history of papillary thyroid carcinoma[,] and status post thyroidectomy[,]" Hernandez retained the residual functional capacity (RFC)[1] to perform light work with additional limitations. Tr. 85, 88.

In May 2020, Hernandez filed an application for supplemental security income and disability insurance benefits alleging a disability onset date of December 4, 2018.[2] Tr. 104–05. Hernandez alleged that she was disabled due to complications from COPD,[3] hypothyroidism, diabetes, and a herniated disc; bipolar disorder, neuropathy in her extremities,[4] memory and cognition issues, anxiety issues, major depressive disorder, high blood pressure, a prolapsed

---

[1]    An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

[2]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[3]    COPD is the abbreviation for chronic obstructive pulmonary disease, a chronic inflammatory lung disease that causes obstructed airflow from the lungs. *COPD*, Mayo Clinic Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679 [https://perma.cc/N6TL-8MBQ].

[4]    Peripheral neuropathy refers to any of the many conditions involving damage to the peripheral nervous system, a "vast communications network that sends signals between the central nervous system—the brain and spinal cord—and the rest of the body. *Peripheral Neuropathy*, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/health-information/disorders/peripheral-neuropathy?search-term=peripheral%20neuropathy [https://perma.cc/WJF4-MHUK].

bladder, and stage 2 thyroid cancer. Tr. 106, 275–82, *see* Tr. 307. The Commissioner denied Hernandez's applications at the initial level and upon reconsideration. Tr. 106–27, 166–81. In January 2022, an Administrative Law Judge (ALJ) held a hearing at which Hernandez and a vocational expert testified. Tr. 46–78. The ALJ issued a written decision in April 2022 finding that Hernandez was not disabled. Tr. 13–36. The ALJ's decision became final in January 2023, when the Appeals Council declined further review. Tr. 1–7; *see* 20 C.F.R. § 404.981.

Hernandez filed this action in March 2023. Doc. 1. In it, she asserts that she is entitled to remand due to "[t]he ALJ's Step Three findings with respect to Listing 11.14[,] [which] contain no discussion of the relevant evidence, comparison to the requirements of the listing, and no explanation of the basis for the ALJ's ultimate conclusion." Doc. 13, at 1.

### Factual background

*1. Personal and vocational evidence*

Hernandez was born in February 1980 and was 38 years old on the alleged disability onset date. Tr. 106. She has her GED. Tr. 308. She previously worked as an induction brazing specialist, a maintenance worker, and a welder. Tr. 73, 308–09.

*2. Medical evidence*[5]

---

[5] This recitation of medical evidence is not intended to be exhaustive. It is limited to relevant facts that were submitted by the parties in their briefs.

3

Throughout the relevant time period, Hernandez received regular care at Mercy Health-Defiance Health Clinic. *See, e.g,* Tr. 736–1174, 1183–1339, 1405–12, 1522–1637, 1655–71. In January 2019, Hernandez underwent an EMG and nerve conduction study ordered by Nicole Morris, APRN-CNP.[6] Tr. 951–53. Morris had ordered testing to investigate the cause of upper extremity symptoms—numbness, tingling, paresthesia,[7] and muscle weakness—which Hernandez reported being worse on her left side than her right. Tr. 951–53. The EMG and nerve conduction results showed "no definite … evidence of lower cervical radiculopathy" although there was evidence of "moderate, median mononeuropathy (carpal tunnel syndrome)" in her wrists and "moderate ulnar motor neuropathy" in her wrists and elbows. Tr. 953.

Hernandez reported that, in her lower extremities, she experienced numbness, tingling, paresthesia, sharp pain, and muscle aches and pains. Tr. 946. She said that she had sharp pain in her feet and legs and worsening chronic pain in her lower back as well as associated numbness, tingling, and weakness that radiated down her right leg. *Id*. Morris ordered am EMG and

---

[6]    APRN is an abbreviation for Advanced Practice Registered Nurse. *Advanced Practice Registered Nurse (APRN)*, OhioAPRN.com, http://www.ohioaprn.com/what-is-an-aprn-.html [https://perma.cc/69UR-XX65]. CNP is an abbreviation for Certified Nurse Practitioner. *Id*.

[7]    Paresthesia is a sensation of tingling, burning, pricking or prickling, itching, "pins and needles," or numbness that occurs on or just underneath the skin. *Paresthesia*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/symptoms/24932-paresthesia [https://perma.cc/ZY5S-FQHL].

nerve conduction study focused on Hernandez's lower extremities. Tr. 946. The test results showed "moderate-to-severe sensory motor peripheral polyneuropathy involving … [Hernandez's] lower [e]xtremities[,] … associated severe distal peroneal and tibial mononeuropathies[,] and responses that … suggest[ed] [the involvement] of L4–L5 and L5–S1."[8] Tr. 947.  There was no evidence of "active denervation changes or chronic reinnervation changes … [and] … no definite … evidence of inflammatory myopathy." *Id*.

In February 2019, Hernandez had an appointment with Steven Copeland, M.D. Tr. 940–42. Hernandez reported that for many months her fingertips had been going numb and tingling during the day. Tr. 940. She didn't experience these symptoms at night. *Id*. Hernandez reported a history of lower extremity numbness and tingling secondary to diabetic neuropathy. *Id*. Dr. Copeland found that Hernandez's sensory response to light touch was slightly diminished in her fingertips. Tr. 941. He diagnosed Hernandez with diabetic polyneuropathy and bilateral carpal tunnel syndrome, noted that she was "more symptomatic [in her] left wrist[,]" and prescribed a left wrist splint. *Id*.

---

[8]     Vertebrae in a person's spine are given letter and number designations according to their location. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id*. The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

A few weeks later, Hernandez had a follow-up with Morris during which Hernandez said she'd been experiencing intermittent, aching, sharp pain in her arms near her hands. Tr. 937. Hernandez rated the severity of her pain as a "6" out of ten and said it limited her behavior "some." *Id*. Morris diagnosed Hernandez with lumbar radiculopathy, "[p]rotrusuion of [a] lumbar intervertebral disc[,]" and degenerative disc disease in the lumbar spine.[9] Tr. 939. Hernandez reported associated symptoms including arthralgia, myalgia,[10] and numbness in her left hand, pain in her back, and pain in her feet. Tr. 937, 939. Hernandez indicated that her foot pain was more severe than the pain in her hands. Tr. 937.

In March 2019, Hernandez had an appointment with Roger P. Thomas, M.D., during which Dr. Thomas gave Hernandez an epidural steroid injection in her lumbar spine. Tr. 930.

In August, Hernandez had a pain management follow-up with Morris to address "significantly increased low back pain" and radiculopathy. Tr. 885. Hernandez reported that the pain radiating down her right leg was so intense that it had induced her to vomit during the office visit. *Id*. Hernandez said that the pain in her leg was constant and persistent but it vacillated in quality—

---

[9]  Radiculopathy happens when a nerve root is compressed or irritated, which can cause pain, numbness, or tingling. *Radiculopathy*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/22564-radiculopathy [https://perma.cc/S8UE-8FYT].

[10]  Myalgia is muscle pain. Dorland's Illustrated Medical Dictionary 1197 (33rd ed. 2020).

throbbing, sharp, dull, or aching—depending on how she moved. *Id*. Hernandez rated her pain at a severity level of "10" out of ten. *Id*. She said that her pain limited her behavior and was aggravated by bending, stretching, straightening, exercising, kneeling, squatting, standing, walking, and climbing stairs. *Id*. Moving her leg up and down "took some of the pressure off." *Id*. Morris found that Hernandez had normal coordination as well as a normal mood, affect, speech, and behavior. Tr. 888. Morris added lumbosacral spondylosis[11] without myelopathy to Hernandez's diagnoses. *Id*. She gave Hernandez an epidural steroid injection at L5 and prescribed Toradol. Tr. 888–89.

Hernandez had a pain management follow-up with Dr. Thomas in September 2019. Tr. 873–78. She reported no change in her right leg pain since her last visit but said the steroid injections had improved her back pain. Tr. 873. Hernandez said that she had persistent, intermittent pain in her "entire back" that limited her ability to stand. *Id*. She rated the severity of her pain as an "8" out of ten. *Id*. Bending backwards aggravated her pain and sleep relieved it. *Id*. Dr. Thomas found that Hernandez was alert and oriented. Tr. 877. Dr. Thomas found that, in her back, Hernandez had a normal range of motion as well as normal extension, flexion, lateral bend, and rotation. *Id*.

---

[11]     Lumbar spondylosis is a nonspecific term that applies to any degenerative condition affecting the disks, vertebral bodies, and associated joints of the lumbar spine. *Lumbar Spondylosis*, Physiopedia, https://www.physio-pedia.com/Lumbar_Spondylosis [https://perma.cc/C5P6-A4V2] (internal citations omitted).

Hernandez had full muscle strength bilaterally in her thigh muscles and negative straight leg raise test results in both legs as well. *Id.* Her toe walk, heel walk, sensation, and gait were normal. *Id.* Dr. Thomas suggested that Hernandez obtain additional magnetic resonance imaging (MRI) of her lumbar spine and see an orthopedic surgeon for an evaluation of her candidacy for spinal surgery. Tr. 877.

Nearly a year later in June 2020, Hernandez had a telehealth appointment with Morris to address right leg radicular pain. Tr. 821. Hernandez reported arthralgia, myalgia, pain in her back, weakness in her right foot, numbness in her right leg, numbness in her left hand, and disturbed sleep. *Id.* Hernandez said that she had previously received chiropractic care and that the chiropractor told her "there [was] nothing else he [could] do for her." *Id.* Morris prescribed physical therapy and listed Hernandez's diagnoses as lumbar radiculopathy, numbness in the left hand, bulging lumbar disc, degenerative disc disease in her lumbar region, lumbosacral spondylosis without myelopathy, and chronic pain due to those diagnoses. Tr. 824.

In mid-June 2020, Hernandez saw neurologist Prasad Policherla, M.D. Tr. 799–814. Dr. Policherla recorded Hernandez's primary symptoms as "clumsiness, focal sensory loss, focal weakness, a loss of balance, memory loss and weakness." Tr. 799. He listed back pain as an "associated symptom." *Id.* Dr. Policherla found that Hernandez's neurological problems were chronic, unchanged, and had gradually developed over several years. *Id.* He noted that

8

Hernandez had previously treated her neurological problems with sleep, bed rest, and aspirin which "provided no relief." *Id*.

Dr. Policherla found that Hernandez was able to follow simple commands without any difficulty and that she had normal speech, language, insight, and judgment. Tr. 807. Her recent and remote memory as well as her attention and concentration were decreased. Tr. 807. Hernandez had a normal shoulder shrug and strength. *Id*. She had normal muscle tone and strength in her extremities. Tr. 807–08. Her sensory response to "light touch, pinprick, position[,] and vibration" were decreased. *Id*. Hernandez's deep tendon reflexes were "decreased." *Id*. She had a slow station and gait but her Romberg's test results were negative.[12] *Id*. Dr. Policherla added "polyneuropathy associated with underlying disease" and ulnar neuropathy in both upper extremities to Hernandez's list of diagnoses. Tr. 809. He ordered an MRI of Hernandez's brain. Tr. 811.

In September 2020, endocrinologist Mahmood Moosa, M.D., conducted an endocrinal evaluation. Tr. 1343. Hernandez denied paresthesia. *Id*. Her diabetic foot examination was normal, including a normal sensory response to vibration. Tr. 1344.

---

[12]     Romberg's test assesses whether a person has balance problems. *Romberg Test*, Cleveland Clinic Health Library https://my.clevelandclinic.org/health/diagnostics/22901-romberg-test [https://perma.cc/XMG2-6MUY].

In October, Hernandez saw Michelle Bacon, APRN-CNP, for a urinary tract infection. Tr. 1208. Bacon noted that Hernandez had a normal range of motion and gait. *Id.*

In November, Hernandez had a pain management follow-up with Dr. Thomas. Tr. 1190. Hernandez reported leg pain, weakness, numbness, disturbed sleep, and pain in her lower back on the right side that sometimes radiated down her right leg. Tr. 1190–91. Hernandez rated the intermittent pain in her right lower back as a "5" out of ten in severity. Tr. 1190. She said that her pain was aggravated by walking and relieved by Celebrex.[13] *Id.* Tylenol "[did] not help." *Id.* Dr. Thomas found that Hernandez had tenderness in her lumbar region but her range of motion, extension, flexion, lateral bend, and rotation were normal. Tr. 1194. Hernandez had full muscle strength in her thigh muscles and negative straight leg raise tests in both legs. *Id.* Her toe walk, heel walk, sensation, and gait were normal. *Id.* Dr. Thomas renewed the order for a lumbar spine MRI and refilled Hernandez's prescription for Celebrex. Tr. 1196.

In December, Hernandez had a pain management follow-up with Dr. Thomas. Tr. 1302–09. She reported no change in her right lumbar pain that radiated down her right leg and indicated that the pain was traveling down

---

[13]    In a "follow-up note" dated the same day as Hernandez's appointment, Dr. Thomas recorded that Hernandez said Celebrex didn't help, reported the location of her pain as her entire back, and indicated that her pain was relieved by relaxation. *See* Tr. 1196.

her left leg as well. Tr. 1303. Hernandez rated her pain at a "6" out of ten and said it limited her ability to bend. Tr. 1303. She reported being depressed and anxious "secondary to her pain problems," Tr. 1303, and that her pain limited her function and quality of life, Tr. 1308. Dr. Thomas found that Hernandez had tenderness in her lumbar region, however, she had a normal range of motion, extension, flexion, lateral bend, and rotation. Tr. 1307. Hernandez had full muscle strength in her thigh muscles and negative straight leg raise tests bilaterally. *Id*. Her toe walk, heel walk, and sensation were normal although her gait was abnormal. Tr. 1307–08. Hernandez's list of diagnoses now included lumbar facet joint syndrome, acute lumbar radiculopathy, diabetic peripheral neuropathy, and essential hypertension. *See* Tr. 1308. Dr. Thomas resubmitted the lumbar spine MRI order and prescribed Baclofen. *Id*. He recommended that Hernandez use a TENS[14] unit and said that she could consult a spinal surgeon after she completed a course of home therapy. *Id*.

In January 2021, Hernandez went to Mercy Health's affiliated hospital for an MRI of her lumbar spine. Tr. 1292–95, 1321–24. The results showed mild facet hypertrophy but no stenosis at L4–L5, a disc bulge causing mild bilateral foraminal stenosis[15] at L5–S1, and a small "caudally migrated right

---

[14]    TENS is an abbreviation for transcutaneous electrical nerve stimulation. *Transcutaneous Electrical Nerve Stimulation*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens [https://perma.cc/5ZW8-MH9J].

[15]    A neural foramen is where a spinal nerve leaves the spinal column and branches out to the rest of the body. *Foraminal Stenosis*, Cleveland Clinic

paracentral disc extrusion abut[ting] the right S1 nerve root."[16] Tr. 1323–24. Hernandez's spine was normally aligned, her vertebral body heights were maintained, and she had "no significant disc herniation, spinal canal stenosis or neural foraminal narrowing" at the other described vertebral junctions. Tr. 1323. Radiologist David A. Beeks, M.D., noted Hernandez's "largely capacious spinal canal. Tr. 1294. He also observed "some disc prolapse at L5–S1" greater on the right side than the left which caused stenosis and impingement of the right side of the nerve root at S1. Tr. 1294.

Later that month, Hernandez saw Dr. Thomas for a pain management follow-up. Tr. 1295–1301. Hernandez reported no improvement in her pain since her last visit, however, she said that the injections improved her right

---

Health Library, https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis [https://perma.cc/7J3H-2BKT]. Stenosis happens when the space inside the spine is too narrow and puts pressure on the spinal cord and nerves. *Spinal Stenosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 [https://perma.cc/L97Q-S77E].

[16]    Disc extrusion is a type of intervertebral disc herniation. *3 Basic Types of Disc Herniation*, NJ Spine and Orthopedic, https://www.njspineandortho.com/3-basic-types-of-disc-herniation/ [https://perma.cc/KWC3-GBG2]. Pressure causes the nucleus pulposus—a jelly-like substance in the center of the disc—to break through the outer wall and leak out. *Id*. A leaking nucleus can compress adjacent nerve roots or the spinal cord leading to back pain, tingling, or a loss of sensation in the extremities. *Id.*

   Lumbar disc herniation with caudal migration is when a piece of the nucleus pulposus detaches and migrates away from the center of the disc. *See Lumbar Disc Herniation with Caudal Migration*, Radiopaedia Cases, https://radiopaedia.org/cases/lumbar-disc-herniation-with-caudal-migration-1?lang=us [https://perma.cc/RMU9-3WTE].

leg radiculopathy. Tr. 1295. Hernandez reported bilateral leg pain that was worse on her right side, numbness radiating down her right leg, and numbness in her feet and ankles. Tr. 1295. Dr. Thomas found that although Hernandez had tenderness in her lumbar region, the range of motion, extension, flexion, lateral bend, and rotation in her back were normal. Tr. 1300. Hernandez had full muscle strength in her thigh muscles and bilateral negative straight leg raise tests. *Id*. Hernandez had a normal toe walk, heel walk, sensation, and gait. *Id*.

X-rays of Hernandez's lumbar spine from February 2021 showed mild "hypertrophic facet changes"[17] and "severe disc height loss" at L5–S1. Tr. 1319. The heights of the rest of Hernandez's discs, as well as the heights of her vertebral bodies, were well-preserved. Tr. 1319. The x-rays also showed lumbar lordosis, however, the curvature of Hernandez's lumbar spine was within normal limits.[18] Tr. 1319.

Later that day, Hernandez had a telehealth appointment with Audrey Crandall, APRN-CNP. Tr. 1290. Crandall noted the worsening course of Hernandez's uncontrolled type 2 diabetes mellitus with hyperglycemia. *Id*.

---

[17]     Facet joints are the joints between the vertebrae in the spinal cord. *Facet Joint Syndrome*, Cedars Sinai, https://www.cedars-sinai.org/health-library/diseases-and-conditions/f/facet-joint-syndrome.html [https://perma.cc/8G6V-T3DX]. Hypertrophy is when a facet joint is so swollen that it can no longer serve as a passageway for nerve roots leaving the spinal cord for the rest of the body. *Id*.

[18]     Lordosis is an increased curvature of the lumbar vertebral column. *See* Dorland's Illustrated Medical Dictionary 1060 (33rd ed. 2020).

Hernandez reported that she "ha[d] not taken her insulin for a few weeks" and "[wa]s not checking her blood sugars." *Id*. She endorsed arthralgia, back pain, and a dysphoric mood. Tr. 1290–91. Crandall found that Hernandez had a normal gait. Tr. 1291.

In late February 2021, Hernandez had a diabetes follow-up with endocrinologist Dr. Moosa. Tr. 1340. Hernandez had a normal foot examination and told Dr. Moosa that she was checking her blood sugar several times per day. Tr. 1341–42. Dr. Moosa provided a diabetic foot care regimen to Hernandez. Tr. 1342.

In March, Hernandez had an appointment with physician Salil Avasthi, M.D., focused primarily on her COPD and other respiratory issues. Tr. 1609. Dr. Avasthi found that Hernandez had "no overt motor deficit." Tr. 1615.

Kristi Skeel Williams, M.D., conducted a psychiatric-medication-management assessment in July. Tr. 1639–54. Dr. Williams found that Hernandez had a relaxed posture with a normal gait and ambulation. Tr. 1653.

In mid-July, Hernandez established care with pain management specialist Darin Scribner, D.O., at Henry County Hospital Pain Management. *See* Tr. 1514. Hernandez reported lower back pain that she rated at a "0" out of ten at its best and an "8" out of ten at its worst. Tr. 1517. Hernandez said that prolonged standing, sitting, and walking as well as housework and lifting exacerbated her pain and that "lying in bed and … frequently changing positions" improved it. *Id*. She reported right leg weakness, numbness in her

feet and hands, tingling in her feet, hands, and right leg, and decreased sensation to light touch in her feet and hands. Tr. 1518. Dr. Scribner found that Hernandez's lumbar and thoracic spine appeared normal and had a normal range of motion, though Dr. Scribner noted Hernandez's paraspinal tenderness. *Id*. Hernandez had a positive seated, straight leg raise test in her right leg and a negative test in her left. *Id*. She had positive bilateral lumbar facet loading test results and a decreased sensory response to light touch in her feet and hands. *Id*. Hernandez's gait and muscle tone were normal and she had full muscle strength. *Id*.

Dr. Scribner assessed Hernandez with lumbar pain, radiculopathy in the lumbar region, and peripheral polyneuropathy likely secondary to diabetes. Tr. 1519. He instructed her to continue to take her medications, stretch daily, and follow up with an orthopedic surgeon for potential decompression and fusion surgery at L5–S1. Tr. 1520. Dr. Scribner advised Hernandez to continue working on her control of her glucose levels and because controlling her diabetes would "likely improve her peripheral neuropathy." Tr. 1511.

Six months later, in January 2022, Hernandez had a chronic pain follow-up with Dr. Scribner. Tr. 1681. She reported numbness, tingling, and weakness in her hands. Tr. 1684. Hernandez described constant, aching pain in her hands that had worsened since her last appointment. *Id*. She rated the severity of her pain as a "4" out of ten at best and a "9" out of ten at worst. *Id*. Dr. Scribner found that Hernandez's lumbar and thoracic spine appeared normal

15

and had a normal range of motion, though Dr. Scribner noted Hernandez's paraspinal tenderness. Tr. 1685. She had bilateral positive lumbar facet load tests and a positive seated straight leg raise test on her right side. *Id.* Hernandez had positive wrist compression and Tinel's tests bilaterally.[19] *Id.* Her muscle tone was normal and she had full muscle strength. *Id.* Hernandez had a normal, coordinated, non-antalgic gait.[20] Tr. 1688. Sensation in her feet and hands in response to light touch was decreased. *Id.* Her insight and judgment were good. *Id.* Dr. Scribner recommended that Hernandez follow-up with an orthopedic surgeon but she said that she didn't want to have surgery. Tr. 1686. Dr. Scribner suggested bilateral wrist splints at night and advised Hernandez to continue taking her medication and stretching. Tr. 1687. He instructed her to see an orthopedist for an evaluation of her hand and wrist symptoms. Tr. 1687; *see* Tr. 1688.

Two weeks later, Michael Muha, M.D., of the Orthopedic Institute of Ohio assessed Hernandez's bilateral wrist pain and hand symptoms. Tr. 1688. Hernandez reported numbness and burning in her hands and said that it felt as if her hands "did not have skin on them." *Id.* Dr. Muha reviewed

---

[19] Tinel's test is for possible nerve compression or damage. *Tinel's Sign*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diagnostics/22662-tinels-sign [https://perma.cc/MK7P-YDGR]. The test assesses the tingling feeling one may experience when a medical provider taps the skin over a nerve. *Id.*

[20] An antalgic gait is an abnormal gait due to a person's efforts to avoid pain. *See* Dorland's Illustrated Medical Dictionary 96 (33rd ed. 2020).

16

Hernandez's past treatment, including test results showing bilateral moderate, median neuropathy in Hernandez's wrists, bilateral moderate ulnar motor neuropathy in her elbows, and no definite evidence of lower cervical radiculopathy in either upper extremity. Tr. 1688; *see also* Tr. 953. Hernandez reported more severe symptoms in her right hand, however, she indicated that her left hand symptoms had been worsening. Tr. 1688. Dr. Muha found that Hernandez had good bilateral radial pulses, warm hands, and pink digits. Tr. 1688. She had a full range of motion in wrists and her digits bilaterally. Tr. 1688–89. Her hands were neither weak nor tender. *Id*. Tinel's and Phalen's tests[21] were positive on her right side and negative on her left. Tr. 1689. Dr. Muha suggested that Hernandez's paresthesia could be resulting from her combination of diabetic neuropathy and carpal tunnel syndrome. Tr. 1689. He recommended additional testing. *Id*.

---

[21]    Phalen's test is for suspected carpal tunnel syndrome. Dorland's Illustrated Medical Dictionary 1896 (33rd ed. 2012).

3. *State agency and other medical opinion evidence*[22]

In March 2021, state agency consulting physician Leon Hughes, M.D., reviewed the medical evidence. Tr. 104–27. Dr. Hughes found that Hernandez's abilities in pushing and pulling with her upper and lower extremities were unlimited. Tr. 112. She could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. *Id*. She had the RFC to occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds. *Id*. She could frequently balance, stoop, kneel, crouch, and crawl. *Id*. According to Dr. Hughes, Hernandez could stand, walk, or sit for a total of about six hours in an eight-hour workday. *Id*. She could handle, finger, and feel no more than frequently. Tr. 113. Dr. Hughes found that Hernandez was capable of labor at a light level of exertion with additional limitations. Tr. 112–13, 116. State agency consulting physician W. Scott Bolz, M.D., reconsidered the evidence in August 2021, and adopted Dr. Hughes's findings. Tr. 128–49.

In March 2021, state agency consulting psychologist Carl Tischler, Ph.D., reviewed the medical evidence. Tr. 110–12. He found that Hernandez

---

[22]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

was no more than moderately limited in three of the four broad areas of mental function: (1) understanding, remembering, or applying information; (2) concentrating, persisting, or maintaining pace; and (3) adapting or managing oneself. Tr. 110. Dr. Tischler found that Hernandez was no more than mildly limited in her ability to interact with others. *Id*. State agency consulting psychologist Kristen Haskins, Psy.D., reconsidered the evidence in July 2021 and adopted Dr. Tischler's findings, including Hernandez's moderate and mild limitations in the four areas of mental functioning. Tr. 146–47.

### 4. Function Report

Hernandez completed a function report in October 2021. Tr. 317–25. The report asked Hernandez to explain how her illness, injuries, and conditions limited her ability to work. Tr. 317. She said that her back and legs had been getting worse and that "all aspects of work" affected her back and legs. *Id*. She indicated that her hands "hardly" worked, she couldn't grasp or hold onto anything "for long," and she dropped things continuously. *Id*. It felt like her feet were always in pain and she could "hardly" wear tennis shoes, let alone work boots. *Id*. Hernandez had coughing fits at random that sometimes lasted for up to 15 minutes. *Id*. Side effects from her edema medication required her to be near a bathroom "constantly." *Id*. Gabapentin, Lyrica, and Klonopin disoriented her. *Id*. Regardless of the shift hours, Hernandez said that she slept too much and "mostly" couldn't wake up. *Id*. When she was able to work, she lost jobs due to poor attendance. *Id*. Her self-esteem had been "gone for

19

years," she was "extremely self[-conscious], and [she] [couldn't] take criticism. Hernandez said that she felt weak "phys[ically], ment[ally], [and] emotionally." *Id*. Hernandez checked boxes indicating that her impairments caused her difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, talking, climbing stairs, seeing, remembering, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others. Tr. 322.

### 5. *Testimonial evidence*

Hernandez and a vocational expert testified during the hearing in January 2022. Tr. 46–78. Hernandez was represented by attorney Theodore Bowman, who began the substantive portion of the hearing with an opening statement advocating that the ALJ find Hernandez disabled. Tr. 52–53. Hernandez then testified. Tr. 54–72.

Hernandez discussed her diabetic neuropathy, which she said had worsened "extremely" since her first ALJ hearing.[23]  Tr. 57. The neuropathy had affected her feet for "a number of years" but, by January 2022, it was affecting her hands as well. Tr. 57–58. Neuropathy made it difficult for Hernandez to hold a pencil or pen, button a button, and use her cell phone. Tr. 58. Using her phone made her hands "go numb." Tr. 58–59. Hernandez is right-

---

[23]    The hearing in Hernandez's prior application took in October 2018. *See* Tr. 82.

hand dominant and said that her symptoms were more severe in her right hand. *Id*.

Hernandez discussed her pain and her attempts to relieve it. She said that her herniated disc caused pain to radiate from the right side of her back to the left and down her right leg. Tr. 60. Her efforts to alleviate pain and inflammation included attending physical therapy, receiving injections, seeing a chiropractor, using a TENS unit, taking medication, and wearing a brace for support and self-awareness. *Id*. Hernandez also discussed her carpal tunnel pain. Tr. 60–61. Her doctor had repeatedly referred her for an assessment in contemplation of surgery and an orthopedic surgeon previously suggested that she have carpal tunnel surgery. *See* Tr. 60–61.

Hernandez testified about her type 2 diabetes, which was uncontrolled. *See* Tr. 64–65. She said that she had a "really hard time" controlling her blood sugar because the cycles of her bipolar disorder "very much" interfered with her ability to follow an insulin schedule. Tr. 64–65.

Hernandez estimated her physical capabilities. Tr. 58–60. She said that she could stand for up to 15 minutes, walk less than half of a city block, sit for "less than a half an hour" at a time, and comfortably lift a maximum of 15 pounds, "if that." Tr. 59–60.

After Hernandez, vocational expert Hermona Robinson testified. Tr. 72–77. According to Robinson, a hypothetical individual with the same age, education, and work experience as Hernandez, with the limitations assessed

in Hernandez's RFC, described below, could not perform Hernandez's past work. Tr. 74. Such an individual could, however, perform light or sedentary unskilled labor as, for example, a sorter, table worker, or cuff folder clerk. Tr. 74–75. A limitation to only occasional handling, fingering, and feeling would be preclusive of all work. Tr. 75–76. Being absent more than once a month on a consistent basis or being off task more than 10% of the workday would also preclude such an individual from all work. Tr. 76.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2020

2. The claimant has not engaged in substantial gainful activity since December 4, 2018, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: diabetes mellitus with neuropathy; COPD; bronchitis; asthma; a history of papillary thyroid carcinoma, status-post thyroidectomy; moderate bilateral carpal tunnel syndrome; ulnar neuropathy bilateral upper extremities; lumbosacral spondylosis; obesity; essential hypertension; bipolar II disorder; unspecified neurocognitive disorder; a generalized anxiety disorder; and an anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders, ropes, or scaffolds. She should avoid workplace hazards such as unprotected heights and dangerous moving mechanical parts. She can occasionally push and pull with the bilateral upper extremities. She can frequently handle and finger with the bilateral upper extremities. She is limited occasional exposure to pulmonary irritants such as dusts, odors, toxins, and fumes. She should not work in areas of extreme heat and/or cold or humidity and/or wetness. She is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work. She is limited to occasional changes in the workplace that are well explained and occasional interaction with supervisors, coworkers, and the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 9, 1980 and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 4, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 17–35.

### Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

24

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The

Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

### Discussion

*Whether substantial evidence supports the ALJ's finding at step three that Hernandez's impairments did not meet the requirements for Peripheral Neuropathy under Listing 11.14.*

At step three of the disability evaluation process, a claimant will be found disabled if his or her impairments meet or equal one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in

the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the medical equivalent of a listing[.]" *Id.* (emphasis in original). There is no heightened articulation standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Listing 11.14 contain two paragraphs—A and B. To satisfy the listing, a claimant must satisfy the requirements in paragraph A *or* paragraph B. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14.[24] To satisfy the listing under paragraph A, a claimant must have "disorganization of motor function" in two extremities that results in an extreme limitation in the claimant's ability to "stand up from a seated position, balance while standing or walking, or use the upper extremities." *Id.*, at 11.14A. To satisfy the listing under paragraph B, a claimant must have an "marked" limitation in physical functioning and a "marked" limitation in one of the following four areas of mental functioning:

---

[24]  For ease of reference, the listing is found here: https://www.ssa.gov/disability/professionals/bluebook/11.00-Neurological-Adult.htm#11_14.

understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting and managing oneself. *Id.* at 11.14B1–4.

The ALJ in his decision found at step three that Hernandez had not shown "persistent disorganization of motor function in two extremities" that had "extreme[ly] limited" her ability to stand from a seated position, balance while standing or walking, or use her upper extremities. Tr. 22; *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14A. The ALJ further found that Hernandez had not demonstrated a "marked" limitation in physical function or a "marked" limited in at least one of the four areas of mental function. Tr. 22; *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14B.

Hernandez argues that the ALJ's consideration of peripheral neuropathy[25] under Listing 11.14 did not address her medical evidence, failed to compare her evidence to the requirements of any listing, and did not explain the conclusion that her impairments did not meet or medically equal Listing 11.14. Doc. 6, at 11. Hernandez accurately points out that the ALJ's step three findings under Listing 11.14 lifts the language from the listing without

---

[25]    Peripheral neuropathy happens when the peripheral nerves—the nerves outside of the brain and spinal cord—are damaged. *Peripheral Neuropathy*, Mayo Clinic Diseases & Conditions database, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 [https://perma.cc/A3PV-GNT6]. It "often causes weakness, numbness and pain, usually in the hands and feet[,] [and] … can affect other areas and body functions including digestion and urination." *Id.*

analysis. *See* Tr. 22; Doc. 6, at 13. She argues that the ALJ thus failed to evaluate her medical evidence, did not compare her evidence to the listing's criteria, and did not provide any explanation for his conclusion. Doc. 6, at 13 (citing Tr. 22).

Hernandez focuses solely on the paragraph containing the ALJ's findings and argues, essentially, that any analysis that isn't articulated there isn't articulated at all. *See* Doc. 6, at 11. While it's true that the ALJ set forth his findings under Listing 11.14 without addressing, *in the same paragraph*, his rationale in arriving at those findings, it isn't true that this paragraph represents the ALJ's full consideration of the listing. *See* Tr. 22, 19–29.

Moreover, an ALJ need not "articulate, at length, the analysis" at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). Hernandez's argument ignores the entirety of the decision except for the paragraph—"a mere 23 words, one sentence in length"—with which she takes issue. Doc. 6, at 14. And the Sixth Circuit has said that an ALJ need not "spell[] out every consideration that went into the step three determination." *Bledsoe*, 165 F. App'x at 411; *see also Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016). An ALJ need not "articulate, at length, the analysis of the medical equivalency issue." *Bledsoe*, 165 F. App'x at 411. He should instead "review all evidence of impairments to see if the sum of [those] impairments is medically equivalent to a "listed impairment." *Id* (citing 20 C.F.R. § 404.1526). As more fully explained below, the ALJ sufficiently "review[ed] all evidence" of

29

Hernandez's impairments and determined that their "sum" did not medically equal a "listed impairment." *See id.*; Tr. 20–29.

The ALJ dedicated several pages to the analysis of Hernandez's evidence under other listings before turning to Listing 11.14. *See* Tr. 20–22. Those listings include 1.15 (Disorders of the skeletal spine resulting in compromise of a nerve root); 1.16 (Lumbar spinal stenosis resulting in compromise of the cauda equina); 1.18 (Abnormality of a major joint(s) in any extremity); 3.02 (Chronic respiratory disorders); 3.03 (Asthma); and diabetes under various listings. *Id*. The ALJ sets forth his findings under Listings 11.14 and 13.09 (Thyroid gland cancer), Tr. 22, then addresses Hernandez's mental impairment allegations under Listings 12.02 (Neurocognitive disorders), 12.04 (Depressive, bipolar, and related disorders), and 12.06 (Anxiety and obsessive-compulsive disorders). Tr. 22–24. As he discussed Hernandez's mental impairment claims, the ALJ compared the record to the four paragraph B areas of mental function. Tr. 19–22. After the four paragraph B areas of mental function, the ALJ assessed the testimonial evidence, objective medical evidence, and medical opinion evidence. *See* Tr. 25–29.

As further explained below, the ALJ provided a basis for his step three conclusion that Hernandez did not satisfy Listing 11.14 elsewhere in his decision. Also addressed blow, Hernandez fails to establish a reasonable likelihood that she could have met or equaled the listing. So even if the ALJ's analysis was insufficient to support his findings under Listing 11.14, the error

was harmless and does not entitle Hernandez to remand. *See Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 365 (6th Cir. 2014) (citing *Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x 411, 416 (6th Cir. 2011)).

Under paragraph A, Listing 11.14 requires significant and persistent disorganization of motor function in two extremities that results in an extreme limitation in the claimant's ability to stand from a seated position, balance while standing or walking, or use his or her upper extremities.[26]  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14A. The ALJ found that Hernandez did not meet any of the requirements of the listing's paragraph A requirements. *See* Tr. 22.

With respect to motor function, ample evidence in the record supports the finding that Hernandez's motor function was not disorganized to the extent required by the listing. For example, providers routinely found that Hernandez had normal motor function insofar as her muscle tone, balance, sensation, heel-

---

[26]    The regulations define the disorganization of a claimant's motor function in the context of Listing 11.14 as interference—due to a neurological disorder—with the movement of two upper or lower extremities. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.00D1. An "upper extremity" includes one's fingers, wrists, hands, arms, and shoulders. *Id*. The two interfered-with extremities can be the two lower extremities, the two upper extremities, or one upper extremity and one lower extremity. *Id*.

For the purposes of Listing 11.14, an "extreme limitation" is an inability to stand up from a seated position, maintain balance in a standing position and while walking, or use one's upper extremities to independently initiate, sustain, and complete work-related activities. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.00D2.

The assessment of motor function under Listing 11.14 depends on the degree to which a claimant's impairments interfere with his or her ability to stand up from a seated position, balance while standing or walking, or use his or her upper extremities including fingers, hands, arms, and shoulders. *Id*.

walk, and toe-walk were normal. *See, e.g.*, Tr. 807–08, 877, 1194, 1300, 1307–08, 1518, 1685, 1688. Most often, Hernandez's providers found that she had a normal gait. *See, e.g.*, Tr. 808, 877, 1194, 1208, 1291, 1300, 1518, 1653, 1685, 1688. On at least one occasion, Dr. Thomas found her gait abnormal. Tr. 1308. Hernandez regularly showed full motor strength in her upper and lower extremities, including her thigh muscles and shoulders. *See, e.g.*, Tr. 877, 1194, 1300, 1518, 1685. Her back and neck were routinely found to have a full range of motion. *See, e.g.*, Tr. 877, 1194, 1208, 1300, 1307, 1518, 1685, 1688. She had "no overt motor deficit." Tr. 1615. In January 2022, Hernandez denied tenderness or weakness in either of her hands and had a full range of motion bilaterally in her wrists and digits. Tr. 1688–89.

Hernandez claimed during her testimony and medical appointments that her back pain limited her ability to stand and walk. *See, e.g.*, Tr. 59–60, 873, 885. The ALJ discussed Hernandez's lumbar spine MRI results and credited her "disk prolapse at L5–S1, right greater than left, and lateral recess stenosis with impingement upon the traversing nerve root on the right." Tr. 29 (citing Tr. 1200, 1294). He further acknowledged Hernandez's back pain in the RFC by limiting her to sedentary employment. Tr. 24–25. The ALJ considered, however, Hernandez's complaints of back pain and the extent to which her complaints were undermined by other facts in the record as well as her own actions. For example, the ALJ discussed the determination of Hernandez's insurance carrier that her facet injections weren't medically necessary. Tr. 27

32

(citing Tr. 1303). The ALJ noted radiologist Dr. Beeks's finding that Hernandez had a "largely capacious spinal canal." *Id*. (citing Tr. 1294). The ALJ juxtaposed findings of a prolapsed disc and nerve impingement, *id*. (citing Tr. 1200, 1294), with the fact that two months after these findings were discovered, Hernandez "no-showed for her appointment." *Id*. (citing Tr. 1280). Despite Hernandez's suggestion that her back pain interfered with her standing and walking, the evidence supports a finding that such interference did not "extreme[ly] limit" her ability to stand from a seated position or balance while standing or walking. Tr. 22; *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14A. So evidence that the ALJ cited elsewhere in his decision—treatments found medically unnecessary, abundant space in the spinal canal, inconsistent attendance at appointments—supported his step three findings under Listing 11.14. *See* Tr. 22, 24–29.

The ALJ also provided sufficient support elsewhere in his decision for his step three finding that Hernandez's ability to use her upper extremities was not "extreme[ly] limited." *See* Tr. 22. For example, the ALJ cited the results of the upper extremity EMG that showed "ulnar neuropathy of both of Hernandez's upper extremities." Tr. 29 (citing Tr. 215). He considered Hernandez's ability to use her upper extremities when he discussed her diagnosis of bilateral paresthesia. Tr. 28 (citing Tr. 1689). He noted, however, that Hernandez appeared to mention her wrist and hand pain during a follow-up appointment for chronic lower back pain. *Id*. (citing Tr. 1689). The ALJ

credited Hernandez's carpal tunnel syndrome but noted her reluctance "to go through with surgery." Tr. 28 (citing Tr. 1686). This evidence supports his finding that Hernandez did not have an extreme limitation in the ability to use her upper extremities as required to satisfy the listing. Tr. 22; *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14A.

As to standing from a seated position and balancing while walking or standing, the ALJ's finding is supported by ample evidence in the record. For example, Hernandez's doctors routinely found that her right and left thigh muscles had "5" out of five—full—strength. *See, e.g*, Tr. 877, 1194, 1300, 1307. Hernandez's lower extremity strength was normal. *See* Tr. 807. She was negative for Romberg's sign which assesses balance issues and speaks directly to the listing's "balance while walking or standing" element. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14A; Tr. 807. This ability is also implicated by Hernandez's normal heel and toe walking. *See* Tr. 877, 1194, 1300, 1307–08. Her posture was relaxed and her gait and ambulation were normal. Tr. 1653. There is no evidence to show that Hernandez was unable to stand from a seated position, no history of falls, no evidence of ataxia, and nothing in the record to suggest a loss of balance. As such there is ample support for finding a lack of extreme limitation in Hernandez's ability to stand from a seated position or maintain balance while walking or standing. *See, e.g.*, Tr. 807–08, 877, 1194, 1208, 1291, 1300, 1307–08, 1518, 1653, 1685, 1688.

34

Concerning the ability to use the upper extremities, evidence in the record further supports the ALJ's determination that Hernandez did not have an extreme limitation. *See* Tr. 22. For example, Hernandez's providers regularly found that she had full motor strength in her upper extremities. *See, e.g.*, Tr. 1300, 1518, 1685. She had a normal shoulder shrug and strength. Tr. 807. Her upper extremity strength was normal. *Id*. During the most recent assessment of her hands, wrists, and digits, Hernandez denied weakness or tenderness in her hands bilaterally and had full ranges of motion in both wrists and both sets of digits. Tr. 1688–89.

As further explained below, even if the ALJ's analysis under Listing 11.14 fell short, that error was harmless because Hernandez hasn't established a reasonable likelihood that her impairments met or equaled the listing. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14; *see also Doolittle v. Comm'r of Soc. Sec.*, No. 1:17-cv-1942, 2018 WL 4615965, at *10 (N.D. Ohio Sept. 26, 2018) ("an ALJ's conclusory findings at Step Three [are] harmless error where the claimant did not put forth sufficient evidence to demonstrate that her impairments met or medically equaled the severity of the listing."), *aff'd* 2019 WL 6464019 (6th Cir. Sept. 4, 2019); *see Smith–Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014); *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x at 365; *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x at 416; *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 642 (6th Cir. 2013).

35

To the extent that the ALJ's step three evaluation was conclusory even considering the support elsewhere in his decision, the court must "determine whether the record evidence raises a substantial question as to [the claimant's] ability to satisfy each requirement of the listing.'" *Doolittle*, 2018 WL 4615965, at *10 (quoting *Smith–Johnson,* 579 F. App'x. at 432–33). The claimant must establish that she could have reasonably met or equaled every requirement of the listing by pointing to specific evidence. *See Smith–Johnson,* 579 F. App'x. at 432. Without such evidence, an ALJ's failure to evaluate a listing at step three is not reversible error. *See id.* at 433; *see also Doolittle*, 2018 WL 4615965, at *10.

As to disorganization of motor function in two extremities, Hernandez simply hasn't pointed to evidence in the record that would show disorganization of motor function in two extremities. Hernandez does not claim, specifically, how she believes she could reasonably meet this "necessary element" of the listing. *See King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 973–74 (6th Cir. 1984). She claims that she met her burden to establish the existence of a substantial question as to whether she could meet or equal Listing 11.14. Doc. 6, at 12. She then cites evidence of "moderate to severe motor peripheral neuropathy in [her] bilateral lower extremities and severe left distal peroneal and tibial mononeuropathy" and "worsening carpal tunnel syndrome in both upper extremities." *Id*. (citing Tr. 946–48, 951–53). Hernandez also cites her "continued complaints of leg weakness, numbness in

36

all of her extremities, diminished sensation to touch in her hands, clumsiness, loss of balance, and memory loss." *Id.*, at 12–13 (citing, e.g., Tr. 59–60, 99–814, 1302–08). The record evidence demonstrates symptoms in Hernandez's lower extremities primarily on the right side. *See, e.g.*, Tr. 60, 946–48, 885, 1190, 1295, 1303 (addressing right leg radiculopathy and pain). At times, the evidence shows Hernandez's upper extremity symptoms affecting her right side more than her left. *See* Tr. 1689 (positive Tinel's and Phalen's tests on her right upper extremity and negative results on her left); Tr. 60–61, 941, 951–53, 1689 (right wrist carpal tunnel and ulnar issues). At other times, the evidence shows that Hernandez's left upper extremity symptoms affected her more than her right. *See* Tr. 940–42 (finding Hernandez "more symptomatic [in her] left wrist" and prescribing a left wrist splint only); *see also* Tr. 951–53 (reports of numbness, tingling, paresthesia, and muscle weakness in her upper extremities that was worse on her left side than her right). There is no evidence, however, that demonstrates interference with the movement of two of Hernandez's extremities due to her neurological disorder. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.00D1.

Hernandez also fails to explain which of the extreme limitations in the listing—standing from a seated position, balancing while walking or standing, or using her upper extremities—she intends for the Court to find the evidence created a substantial question that she could meet. *See* Doc. 6, at 12. Unfortunately for Hernandez, she needs more evidence than she provides to

37

establish the existence of such a question. *See Sheeks*, 544 F.App'x at 642 ("A substantial question about whether a claimant meets a listing requires more than what Sheeks has put forth here, a mere toehold in the record on an essential element of the listing."); *see also Doolittle*, 2018 WL 4615965, at *11 ("While the RFC recognizes Plaintiff has some difficulty standing or walking for long periods of time, Plaintiff does not point to any evidence that this limitation is an *extreme* one, as required by the Listing, nor does she raise a 'substantial question' as to whether she satisfies any of the other requirements of the Listing.")

Hernandez thus fails to establish with specific evidence the significant and persistent disorganization of motor function in two of her extremities which resulted in an extreme limitation in her ability to stand from a seated position, balance while standing or walking, or use her upper extremities. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14A; *see also Szabo v. Kijakazi*, No. 1:20-cv-1206, 2021 WL 3743192, at *3 (N.D. Ohio Aug. 6, 2021) (although "claimant alleges that she has chronic pain, tingling, and numbness in her feet, hands, and fingers, and the records demonstrate that she has been diagnosed with carpal tunnel syndrome[,]… there is no evidence demonstrating that limitations related to her carpal tunnel symptoms meet the requirements necessary to find an extreme limitation as described."), *report and recommendation adopted,* 2021 WL 3737953 (N.D. Ohio Aug. 23, 2021)

Hernandez says that the evidence established a substantial question as to whether she met or equaled Listing 11.14. Doc. 6, at 12. She cites *Forrest* and acknowledges her burden to present evidence to demonstrate how her impairments meet every element of a listing. *Id.* She asserts that she has fulfilled this burden and cites the EMG and nerve conduction study findings showing "moderate to severe motor peripheral neuropathy in [her] bilateral lower extremities and severe left distal peroneal and tibial mononeuropathy" and "worsening carpal tunnel syndrome in both upper extremities." Doc. 6, at 12 (citing Tr. 946–48, 951–53). She also cites her "continued [subjective] complaints of leg weakness, numbness in all of her extremities, diminished sensation to touch in her hands, clumsiness, loss of balance, and memory loss." *Id.* at 12–13 (citing Tr. 59–60, 99–814, 1302–08).

As the Commissioner points out, however, this evidence does not establish a reasonable likelihood that Hernandez could meet or medically equal Listing 11.14. *See* Doc. 9, at 9–10. Hernandez relies on evidence that does not address her ability to stand from a seated position, maintain balance while standing or walking, or use her upper extremities. *See* Doc. 6, at 12–13 (citing, *e.g.*, Tr. 59–60, 799–814, 1302–08); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14A. What's more, Hernandez's EMG and nerve conduction study results from January 2019 are countered by more recent exam findings from January 2022, in which Hernandez had normal motor strength, a coordinated, non-antalgic gait, a full range of motion in both her right and left wrists and digits,

and denied weakness or tenderness in her hands. *See* Tr. 1685, 1688–89. So Hernandez fails to establish a reasonable likelihood that she could meet or equal all of the elements of the listing and thus hasn't shown that a substantial question exists for which remand is warranted. *See Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986); *King,* 742 F.2d at 973–74 (the claimant has the burden to establish evidence of all elements necessary to meet a listing).

Under paragraph B, Listing 11.14 requires a marked limitation in physical function and a marked limitation in any of the four areas of mental function. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14B. A marked limitation in physical function under Listing 11.14B requires the claimant to establish a "serious[] limitation" in the "ability to independently initiate, sustain, and complete work-related physical activities…such as standing, balancing, walking, using both upper extremities for fine and gross movements or … using one upper and one lower extremity" due to the "persistent or intermittent symptoms" of a neurological disease. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.00G2a.

The ALJ found that the record did not support a marked limitation in physical function or a marked limitation any of the four areas of mental function: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or

40

(4) adapting or managing oneself. *See* Tr. 22 (citing 20 C.F.R. § Pt. 404, Subpt. P, App.1, 11.14B).

As with the elements of paragraph A, factual findings elsewhere in the ALJ's decision support the finding that Hernandez did not have a marked limitation in physical function under Listing 11.14B. *See* Tr. 22, 25–29; *see also, e.g*, Tr. 807–08, 877, 1194, 1208, 1300, 1307–08, 1518, 1653, 1685, 1688–89. There is thus sufficient evidence to support elsewhere in the decision to support the ALJ's conclusion that Hernandez did not have a marked limitation in physical function. *See* Tr. 22.

In the context of mental impairment analysis of Listings 12.02, 12.04, and 12.06, the ALJ assessed Hernandez under the four paragraph B areas of mental function and found that she was no more than moderately limited in each area. *See* Tr. 22–24. While it may be that an ALJ's analysis of the four paragraph B areas of mental function under mental impairment listings do not apply to Listing 11.14B, see *Szabo v. Kijakazi*, No. 1:20-cv-1206-BYP, 2021 WL 3743192, at *6 (N.D. Ohio Aug. 6, 2021), 2021 WL 3737953 (N.D. Ohio Aug. 23, 2021) (citing *Betts v. Berryhill*, No. 5:18CV1274, 2019 WL 1544222, at *1 (N.D. Ohio Apr. 9, 2019), the ALJ addressed the four areas of mental function elsewhere in his decision.

For example, the ALJ analyzed the medical opinion of consulting psychologist Christopher C. Ward, which the ALJ found somewhat persuasive. Tr. 27, 28–29. As to the ability to adapt or manage oneself and the ability to

socially interact, the ALJ recited Dr. Ward's findings that Hernandez had not been "enrolled in special education services during schooling for learning or behavioral problems" and "cited a variable work history, with at least one position that lasted for multiple years." Tr. 27 (citing Tr. 1394–95). The ALJ noted that Hernandez lived with her children. *Id*. During Dr. Ward's interview, the ALJ wrote, Hernandez was cooperative. *Id*. Dr. Ward "adequately established" a rapport with her, although he noted that she "presented as depressed with flattened affect." *Id*. The ALJ also considered that "at the University of Toledo," Hernandez reported "acute psychosocial stressors" such as "caring for her children" and "chronic pain." Tr. 27 (citing Tr. 1438). She "denied feeling down and depressed, or hopeless" and although she reported "poor concentration at times," the ALJ noted that Hernandez indicated she was "able to function at [that] level at [that] time." Tr. 27–28 (citing Tr. 1438). The ALJ noted Dr. Ward's finding that Hernandez did not "present with indications of mental health difficulties" that would affect her ability to interact or manage pressure in a work setting. Tr. 28 (citing Tr. 1395). The ALJ cited a visit at Henry County Hospital during which the doctor "noted that [Hernandez's] mental status was grossly normal." Tr. 28 (citing Tr. 1519). So the ALJ sufficiently supported his determination that Hernandez did not have a marked limitation in adapting or managing herself or a marked limitation in interacting with others. *See* 20 C.F.R. § Pt. 404, Subpt. P, App.1, 11.14B.

The ALJ found that Hernandez's ability to understand, remember, or apply information and ability to concentrate, persist, or maintain pace were not markedly limited. *See* Tr. 22. These findings were supported elsewhere in the decision. *See* Tr. 22, 28–29. For example, when the ALJ discussed the opinions of Dr. Ward, the ALJ noted that Hernandez's performance during testing suggested difficulty with concentration and focus. Tr. 28 (citing Tr. 1395). The ALJ also noted that Hernandez's performance during testing showed difficulty with remembering, but not understanding instructions. *Id.* The findings of the state agency doctors, which the ALJ found somewhat persuasive, also supported the ALJ's finding that Hernandez did not have a marked limitation in the areas of understanding, remembering, or applying information and concentrating, persisting, or maintaining pace. *See* Tr. 22, Tr. 29 (citing Tr. 114, 125, 1394–95); 20 C.F.R. § Pt. 404, Subpt. P, App.1, 11.14B.

Hernandez, on the other hand, doesn't mention the four paragraph B areas of mental function in her brief and hasn't specified evidence showing a marked limitation in at least one area. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14B. Hernandez thus fails to present evidence that establishes a serious limitation in her abilities at the marked level required by paragraph B of the listing. *See id.* She hasn't shown that her impairments affected her ability to initiate, sustain, or complete work-related physical activities. *See id.* And an ALJ's failure to support a step three finding is harmless error where the claimant hasn't presented sufficient evidence that her impairments could have

met or medically equaled the severity of the listing. *See*, *e.g.*, *Szabo*, 2021 WL 3743192, at \*6  (citing *Doolittle*, 2018 WL 4615965, at \*10). So the ALJ's step three analysis of paragraph B under Listing 11.14 is, at most, harmless error.

In sum, the ALJ supported his step three findings under Listing 11.14 with sufficient factual evidence elsewhere in his decision. *See* Tr. 22, 26–29. Hernandez fails to demonstrate a reasonable possibility that she could meet or equal Listing 11.14 or any other listing. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.14B. Contrary to her assertion, she has not "fulfilled her burden to present evidence to raise this substantial question." *See* Doc. 6, at 12–13; *see also Doolittle*, 2018 WL 4615965, at \*11. She hasn't shown that there "remains an open question," let alone that such a question is a *substantial* one that justifies remand. *See Sheeks*, 544 F. App'x at 642 ("Sheeks must do more that show that the ALJ's decision leaves open the question whether he meets listing 12.05(C). He must show that the open question is a *substantial* one that justifies remand.") (internal citations omitted); *see also Thacker*, 93 F. App'x at 727–728 (a claimant must show that she meets or equals a listed impairment through the presentation of "specific medical findings satisfying the various tests" of the listing) (internal citations omitted).

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: November 6, 2023

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)